**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JANET SPECIALE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No.  04 C 5390** |
| **v.** | ) | |
| | ) | |
| **BLUE CROSS AND BLUE SHIELD** | ) | **HONORABLE DAVID H. COAR** |
| **ASSOCIATION and THE NON-** | ) | |
| **CONTRIBUTORY NATIONAL LONG** | ) | |
| **TERM DISABILITY PROGRAM,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

**Background Facts**

Janet Speciale was employed as a senior account executive by Health Care Service Corporation ("HCSC") from June 22, 1998 through November 7, 2000. HCSC was an independent licensee of the Blue Cross and Blue Shield Association ("BCBSA"). Her position was fast paced, involving a constantly varying array of tasks that required frequent interruption to respond to problems or emergencies. As a senior account executive, she spent up to half her working time traveling to meetings with clients and brokers, and to training meetings. Between one- and two-thirds of her work week involved sitting and standing. She constantly engaged in typing or fine finger movement, talking, and listening; occasionally climbed stairs or walked or lifted up to 50 pounds from either floor or table level. Her position required overtime seven or more times per month.

As a benefit of her employment, Speciale was eligible to participate in a long term disability program ("the Plan") administered by the National Employee Benefits Committee ("NEBC") of BCBSA. The NEBC has delegated authority for day-to-day operation of the Program to the National Employee Benefits Administration, a department of BCBSA.

Speciale ceased working on November 7, 2000, due to pain, difficulty with concentration, fatigue and other symptoms. In addition to fibromyalgia, her doctors began to suspect she might be developing a demyelinating disease such as multiple sclerosis ("MS"). She had several clinical tests which seemed to indicate MS, but a lumbar puncture ultimately demonstrated that she had not developed MS. Speciale also has recurrent sinusitis and chronic kidney stones, although these are not the primary focus of the current controversy. To control her various pain and fibromyalgia symptoms, Speciale takes over ten prescription medications daily.

From November 27, 2000 through May 18, 2001, Speciale received short-term disability benefits from the Fort Dearborn Life Insurance Company. For the purpose of these benefits, her first date of disability was November 8, 2000. On April 18, 2001, Speciale filed an application for long-term disability ("LTD") benefits, giving November 7, 2000 as her last day of work. Speciale claimed she was disabled and unable to return to work as a result of numbness and tingling in her legs, feet, and hands; constant exhaustion; pain that made it impossible to concentrate, sit, stand, use the phone, drive or walk for more than short periods of time; and fibromyalgia. At that time, Speciale's physicians suspected that she was suffering from multiple sclerosis or another demyelinating disease. Speciale had worked since 1986 with fibromyalgia, but stated that her condition had progressively worsened over the previous year. On April 25, 2001, Dr. Brian O'Shaughnessy, a neurologist, completed an LTD physician's statement for

Speciale, on which he noted that "due to the severity of her symptoms, she is unable to work in any capacity." He further reported that Speciale had been referred to a Dr. Vern for MS evaluation and to Dr. Dennis Keane, a physiatrist who specialized in pain management.

**Medical Evidence**

Speciale saw Dr. Snydersmith on October 19, 2000 for her fibromyalgia and "chronic pain syndrome and some atypical neurological symptoms." Dr. Kevin Snydersmith noted neurological symptoms, including occasional shooting pains in her extremities, and numbness in her thighs. Dr. Snydersmith instructed Speciale to follow-up with Dr. Ann Winny, a rheumatologist. According to Dr. Winny's October 28, 2000, treatment notes, Speciale's condition was getting progressively worse. Dr. Winny administered three trigger point injections, designed to ease symptoms of fibromyalgia. She and Speciale discussed whether Speciale would be able to continue working because Speciale's job required a lot of travel, which Speciale found difficult.

On November 1, 2000, Speciale saw Dr. Brian E. O'Shaughnessy and complained of increased numbness along the left side of her body, in her heel and foot, in her hand up to her shoulder, and under her eye and in her lips. Pain accompanied the numbness. About six weeks later, Dr. Dennis Keane, a physiatrist who specializes in pain management, examined Speciale. His notes reflect a history of fibromyalgia over the previous fourteen years, chronic low back pain which increased in intensity and frequency over the course of the preceding months, and decreased sensitivity to pin prick sensation on the left leg compared to the right.

Dr. Snydersmith saw Speciale again on January 16, 2001, for complaints of pain, numbness, and swelling. He noted that she continued to have problems with paresthesias, or skin

sensations with no apparent cause, and was experiencing balance problems. Because of gait instability and paresthesia, she needed a second cane, and Dr. Snydersmith gave her a quad cane, or a cane with four feet at its base.

Over the course of the next few months, Speciale underwent a variety of tests relating to her possible MS, including visually evoked response and somatosensory evoked response tests, an MRI of her thoracic spine, electronystagmography (ENG), audiology testing, and a lumbar puncture (often called a "spinal tap"). During that time period, Speciale continued to see her regular treating physicians. On February 19, 2001, she saw Dr. Keane for a flare-up of neck pain that had started in December 2000. He stated that his impression was that Speciale had myofascial and cervical pain and possible MS. Later that month, Speciale saw Dr. O'Shaughnessy about complaints of severe fatigue and pain in the lower back and legs. His notes indicate that she was having some difficulty walking. In early March, Dr. Snydersmith gave Speciale Demerol for her severe pain in her back and hips. He assessed her condition as an "exacerbation" of MS with severe pain. On March 12, 2001, Dr. O'Shaughnessy noted that Speciale complained of fatigue and numbness and that her fait was unsteady. Speciale saw Dr. Keane on that day also; his notes reflect leg pain and tightness, and back tenderness and muscle tightness.

Dr. Boris Vern, a neurologist at the University of Illinois, Chicago, examined Speciale on March 15, 2001. His written impression of her condition was that her "sensory symptoms are overshadowed and probably colored by her chronic pain, which seems to b[e] of myofascial origin." He reported that the available lab studies did not strongly support a finding of MS. Speciale underwent an ENG on March 21, 2001. The clinical impressions included vertical

"flutter" when Speciale's eyes were closed, which was "too fast" to be due to eyeblinking, "and definitely begins as soon as patient begins tasking." (Pl.'s L.R.56.1 St. App. at BCBSA 000179.)

Speciale returned to Dr. Keane on April 2, 2001, after a week-long vacation in Arizona. She reported some improvement but Dr. Keane noted that her gait was slightly unsteady and that she was using a quad cane when she walked. On May 17, 2001, Dr. O'Shaughnessy reported in his progress notes that although Dr. Vern was not convinced Speciale had a demyelinating disease such as MS, she had some abnormal test results suggestive of such a diagnosis. In addition, she was reporting problems with dizziness and hearing, as well as significant fatigue and difficulty with her legs and feet. He opted to try steroid treatment again, but opined that MS was quite possible. In a letter dated June 11, 2001, Dr. O'Shaughnessy wrote that he felt Speciale's "clinical picture is most compatible with multiple sclerosis." In addition, he "[did] not see her improving enough at this time to return to work." (Pl.'s L.R. 56.1 Stmt. App. at BCBSA 000167.) Dr. Snydersmith, in a letter dated June 18, 2001, reported that "[i]t is my medical opinion that [Speciale] is totally physically disabled with a primary diagnosis of multiple sclerosis.... She has carried the diagnosis of chronic pain syndrome and still does...." (Pl.'s L.R. 56.1 Stmt. App. at BCBSA 000168.)

On July 24, 2001, Dr. Winny reported in a progress note that Speciale had fibromyalgia and chronic pain syndrome, and had recently been diagnosed with gastritis. In addition, Speciale was having significant pain in her knees. Dr. Winny noted that Speciale "is probably disabled at this point from the fact that her symptoms are on and off and make it very difficult to walk on a regular basis." (Pl.'s L.R. 56.1 Stmt. App. at BCBSA 000134.) Two days later, Speciale

underwent a lumbar puncture and cerebrospinalfluid specimen collection, which was negative for MS.

In a telephone conversation with BCBSA's Nurse Sue Majewski on August 27, 2001, Dr. Snydersmith stated that MS had been ruled out as a diagnosis, and that Speciale's diagnosis was fibromyalgia. Majewski asked what was different now because Speciale had been working with fibromyalgia for years. Dr. Snydersmith reported that severe pain and muscle spasms had led to a slow but progressive decline in her functional ability. In addition, he stated that Speciale was unable to sit, stand or walk for long periods of time, although the exact duration would depend on how she was feeling that day.

**Long Term Disability Benefits Application and Appeals**

Speciale applied for LTD Benefits on April 18, 2001. On August 1, 2001, BCBSA's Program Medical Director, Dr. E. Richard Blonsky, filed out a Physician's Recommendation giving his opinion that Speciale was not disabled. As support, he noted that he had reviewed Speciale's file and had a "lengthy" conversation with Dr. O'Shaughnessy. According to Dr. Blonsky, Dr. O'Shaughnessy felt that Speciale had collagen vascular disease but that it could not be proven. Dr. Blonsky characterized Speciale's case as "very marginal" because "there are no absolute confirmatory findings, just a lot of subjective complaints." Speciale had "had fibromyalgia for 20 years and worked." He further noted that he was "not totally convinced of her disability" and inquired whether there were "any H.R., performance issues?" (Pl.'s L.R. 56.1 Stmt. App. at BCBSA 000144.) In a supplemental Physician's Recommendation dated September 5, 2001, Dr. Blonsky stated that Speciale's medical records showed she did not have

MS. He also stated that "Dr. Keane's notes do not describe a disabled individual." (Pl.'s L.R. 56.1 Stmt. App. at BCBSA 000120.)

BCBSA's Medical Review Committee ("the Committee") determined on September 24, 2001 that Speciale was not disabled through May 1, 2001. The following day, a Transferable Skills Analysis/Wage Earning Capacity report was drafted at the request of BCBSA's Nurse Sue Majewski. The limitations included were to avoid bending and twisting, to allow for alternation between sitting and standing, and to limit employment opportunities to those in the Chicago area appropriate to Speciale's skill set and which paid wages in a range comparable to those she earned while at HCSC. The limitations did not include travel or overtime restrictions or any accommodation for resting periods during the work day.

On October 30, 2001, BCBSA notified Speciale that her claim for disability benefits had been denied because the medical evidence did not support a finding of disability on or before May 1, 2001, the date of her potential eligibility.

Speciale filed a timely appeal of BCBSA's decision denying benefits on January 29, 2002; she also requested additional time to submit new evidence. This request was granted. On April 4, 2002, Speciale timely submitted additional evidence including a fibromyalgia functional capacity questionnaire completed by Dr. Winny on December 26, 2001; Dr. Winny's rheumatology progress notes from July 2000 through December 2001; and Dr. Keane's November 2001 through January 7, 2002 progress notes were submitted to BCBSA. Speciale's attorneys also filed written argument in support of her appeal.

Dr. Winny reported on the fibromyalgia functional capacity questionnaire that Speciale met the American Rheumatological Association's criteria for fibromyalgia, specifically, multiple

tender points, nonrestorative sleep, chronic fatigue, morning stiffness, muscle weakness, irritable bowel syndrome, frequent severe headaches, temporomandibular joint dysfunction, numbness and tingling, and dysmenorrhea. In addition, Dr. Winny reported Speciale had pain in her lumbosacral, cervical and thoracic spine, bilateral chest pain, left shoulder pain, and bilateral pain in her arms, hips, legs, knees, ankles, and feet. The pain occurred daily and was constant. It could be precipitated by cold, stress, and fatigue. Speciale's pain frequently interfered with her attention and concentration abilities and markedly limited her ability to deal with work stress. Medication for her symptoms caused drowsiness and upset stomach. According to Dr. Winny, Speciale could sit for only ten minutes at a time, stand for only fifteen minutes at a time, and sit or stand for less than two hours in a typical work day; all of these conditions related back to May 1, 2001. Moreover, Dr. Winny's progress notes reflect that Speciale had received trigger point injections in July and September 2000, and January 2001. In October 2000, Winny noted that Speciale was getting steadily worse.

Dr. Keane's progress notes from November 2001 reported that Speciale was complaining of pain "all over" and anxiety. He assessed her with fibromyalgia and depression/anxiety. Speciale returned to Dr. Keane on January 7, 2002. He reported that she was not sleeping well, despite taking the sleeping medication Ambien, and was complaining of severe pain flare-ups. He diagnosed her with fibromyalgia, depression, anxiety and localized myofascial pain in her cervical muscles.

Dr. Blonsky reviewed Speciale's file again on her appeal. On April 17, 2002, he wrote that he had spoken with Dr. Winny by telephone and noted that "it is her perception that claimant's job requires extensive travel/driving which aggravates her condition. Dr. Winny sees

the problem as myofascial/fibromyalgia-like and notes that trigger point injections control the symptoms for a while." Further, he wrote in his notes, "Dr. Winny agreed (4/15/02) that a job that did not require these activities would probably be tolerable and could be attempted–even currently, although we are looking at the period beginning 5/1/01." (Pl.'s L.R. 56.1 Stmt. App. at BCBSA 000422-423.) He indicated that further investigation was not recommended. A Transferable Skills Analysis was prepared on April 23, 2002, including restrictions on bending and twisting, alternating sitting and standing, and avoiding travel in the course of employment. The TSA identified three positions in the greater Chicago area that met those restrictions and paid within the salary range identified by Speciale's employer. The TSA did not address restrictions relating to fatigue or side effects from medication.

On May 8, 2002, BCBSA notified Speciale that it was upholding the decision to deny LTD benefits because "Ms. Speciale's medical records report her subjective symptoms, but do not describe a wholly disabled person and do not objectively identify functional impairments." (Pl.'s L.R. 56.1 Stmt. App. at BCBSA 000385.) As a result, Assistant Secretary Barbara Grant, R.N., concluded "that the weight of medical opinion fails to support that Ms. Speciale is disabled now or was disabled May 1, 2001, the date she was potentially eligible for LTD benefits." (Pl.'s L.R. 56.1 Stmt. App. at BCBSA 000386.)

Speciale filed this action on August 16, 2004, under § 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), seeking an award of benefits under the LTD Plan.

Before this Court are cross-motions for summary judgment. For the reasons set forth below, Defendant's motion for summary judgment is denied and Plaintiff's motion is granted.

**Standard of Review**

Summary judgment is appropriate "if the pleadings, depositions, and answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Schuster v. Lucent Technologies, Inc.*, 327 F.3d 569, 573 (7th Cir. 2003). In deciding a motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in her favor. *See Haywood v. Lucent Technologies*, 323 F.3d 524 (7th Cir. 2003). A non-moving party who bears the burden of proof on a specific issue must demonstrate by specific factual allegations that there is a genuine issue of material fact in dispute. *McMillian v. Svetanoff*, 878 F.2d 186, 188 (7th Cir. 1989).

**Analysis**

A denial of benefits will be reviewed *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If the plan confers discretionary authority, then a denial of benefits will be reviewed under the arbitrary and capricious standard. *See Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001). In addition, the inclusion of what has been designated "safe harbor" language clearly giving the plan administrator discretionary power helps ensure deferential review. The Seventh Circuit has found sentences such as, "Benefits under this plan will be paid only if the plan administrator decides in his discretion that the applicant is entitled to them" to constitute safe harbor for the purposes of review, *Herzenberger v. Standard Ins. Co.*,

205 F.3d 327, 331 (7th Cir. 2000), although that precise wording is not required. *Militello v. Central States, Southeast & Southwest Areas Pension Fund*, 360 F.3d 681, 685 (7th Cir. 2004). The Seventh Circuit issued an opinion reiterating the necessity of including a safe harbor provision in plan documents in order to "insulate" plan decisions from plenary review. *Diaz v. Prudential Ins. Co.*, 424 F.3d 635, 637-638 (7th Cir. 2005).

Under the arbitrary and capricious standard, an administrator's decision will not be overturned if "(1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome; (2) the decisions is based on a reasonable explanation of relevant plan documents; or (3) the administrator has based its decision on a consideration of the relevant factors that encompass important aspects of the problem." *Hess*, 274 F.3d at 461 (quotations omitted); *see also Trombin v. Cragin Fed. Bank for Sav. Employee Stock Ownership Plan*, 102 F.3d 1435, 1438 (7th Cir. 1996). Stated otherwise, "the administrator's decision will only be overturned if it is 'downright unreasonable.'" *Carr v. Gates Health Care Plan*, 195 F.3d 292, 294 (7th Cir. 1999) (quoting *Butler v. Encyclopedia Brittanica, Inc.*, 41 F.3d 285, 288 (7th Cir. 1994)). An interpretation is "unreasonable" when it conflicts with the plain language of the Plan. *Cozzie v. Metropolitan Life Ins. Co.*, 140 F.3d 1104, 1109 (7th Cir. 1998). Because this is a deferential standard of review, courts will "consider only the evidence that was before the administrator when it made its decision." *Hess*, 274 F.3d at 462, *quoted in Militello*, 360 F.3d at 686.

The BCBSA Plan in effect at the time Speciale applied for benefits stated as follows:

The BCBS long term disability plan ("the Plan") defines "disabled" to mean
that a Participant is, determined on the basis of medical evidence satisfactory to
the Committee, wholly prevented, by reason of mental or physical disability, from
engaging in any occupation comparable to that in which he was engaged for the

Employer, at the time his disability occurred. An occupation is considered comparable to that in which the Participant was engaged for the Employer if the earnings potential of the occupation is comparable to the employee's salary range at the time he became Disabled.... The determination as to whether a Participant is "Disabled" shall be based on medical evidence satisfactory to the Committee in its sole discretion.

(Defs.' Exh. B, at 6).

The Plan further states that "[a] Participant shall be entitled to benefits under this Program if he is found, on the basis of medical evidence satisfactory to the Committee, to be Disabled. The date when a Participant becomes Disabled shall be determined by the Committee." (Defs.' Exh. B, at 7.)

BCBSA maintains that it is clear that this language confers discretion on the Plan's decision making body and that deferential arbitrary and capricious review is appropriate. Plaintiff appears to agree that deferential review is applicable. In light of the Seventh Circuit's *Diaz* decision, however, the issue is not so clear cut as Defendants maintain. *See Diaz v. Prudential Ins. Co.*, 424 F.3d 635 (7th Cir. 2005). The language alerts plan participants that the Committee has "sole discretion" to determine whether a Participant is disabled "based on medical evidence satisfactory to the Committee," but that is hardly surprising. It would be an odd plan indeed that permitted participants to determine whether they were disabled or to submit their own notations regarding medical conditions. As in *Diaz*, "[w]e must therefore ask *what* must be satisfactory to the plan's administrator: did the evidence comply with prescribed standards ..., or did the evidence comply with the plan administrator's subjective notions of eligibility, disability, or other terms in the plan...." *Diaz*, 424 F.3d at 639. In *Diaz*, the LTD plan required "'proof of continuing disability, satisfactory to Prudential, indicating that [the claimant is] under the regular care of a doctor.'" *Id.* By contrast, BCBSA' plan requires "medical

-12-

evidence satisfactory to the Committee [demonstrating that a claimant is] wholly prevented, by reasons of mental or physical disability, from engaging in any occupation comparable to that in which he was engaged for the Employer, at the time his disability occurred." (Def.'s L.R. 56.1 Stmt. App. at BCBSA 000006.) This is not an clear example of *Herzberger*-like language in which the Participant undeniably has notice of the administrator's discretion over a benefits award. Indeed, a Participant might be forgiven for reading the definition of disability more than once yet being confused. From the language, it is not entirely clear what "sole discretion" is meant to modify: whether the satisfactoriness of the medical evidence or the Committee's reception of the medical evidence. Ultimately, however, the language of the Plan does alert the claimant, however awkwardly, that the Committee has the sole discretion to determine whether it is satisfied by the claimant's medical evidence and, thus, whether it will find the claimant disabled under the Plan. For that reason, deferential review is appropriate.

Under arbitrary and capricious review, a court considers "the impartiality of the decision making body, the complexity of the issues, the extent to which the decision makers utilized the assistance of experts where necessary, and finally the soundness of the fiduciary's ratiocination." *Chalmers v. Quaker Oats Co.*, 61 F.3d 1340, 1344 (7th Cir. 1995). Speciale contests the first, second, and fourth of these factors.

Speciale contends that BCBSA' decisions to deny her LTD benefits was unreasonable, arbitrary, and capricious, and denied her a full and fair review. She argues that BCBSA ignored or rejected evidence of her symptoms and her progressive physical deterioration over the latter half of 2000. Instead, BCBSA relied on the evidence that her lumbar puncture was negative for multiple sclerosis and unfairly extrapolated from those results that "MS and other neurological

disorders have been eliminated." According to Speciale, BCBSA engaged in a selective review of the medical evidence supporting her claim, which denied her a full and fair review as required by Section 503 of ERISA. 29 U.S.C. § 1133.

BCBSA argues that its denial of benefits was supported by the evidence in the record and was not arbitrary or capricious. Specifically, BCBSA contends that the Plan Administrator[1] acted reasonably when she relied on the opinion of the Plan's expert medical consultant and his review of the medical evidence in her denial of Speciale's appeal.

As a general matter, ERISA and the related federal regulations require that "specific reasons for [claim] denial be communicated to the claimant and that the claimant be afforded an opportunity for 'full and fair review' by the administrator." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003); *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 688 (7th Cir. 1992). Courts have held that a full and fair review must put claimant on notice as to the evidence upon which the decision-maker relied in the initial denial, provide an opportunity for the claimant to address that evidence's accuracy and reliability, and require the decision-maker to consider the evidence presented by both parties prior to deciding the appeal of benefits denial. *Brown v. Retirement Comm. of Briggs & Stratton Retirement Plan*, 797 F.2d 521, 534 (7th Cir. 1986); *White v. Airline Pilots Ass'n, Int'l*, 364 F. Supp. 2d 747, 761 (N.D.Ill. 2005). Federal regulations also require that the notice of initial claim denial must include

(1) The specific reason or reasons for the denial;
(2) Specific reference to pertinent plan provisions on which the denial is based;

---

[1] The Plan Administrator was the Assistant Secretary of the National Employee Benefits Committee, Barbara Grant, R.N.

(3) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and
(4) Appropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review.

29 C.F.R. § 2560.503-1(f). The purpose of these requirements is to permit a claimant who seeks to appeal a denial to the plan administrator to address the determinative issues and have "a fair chance to present his case." *Halpin*, 962 F.2d at 689. Plans are not required to comply exactly with the regulations, "substantial compliance" is sufficient. *Id*. at 690. The determination of whether a plan substantially complied with applicable regulations is "necessarily a fact-intensive inquiry." *Id*.

In a letter dated October 30, 2001, BCBSA notified Speciale that it had denied her claim for benefits because the Medical Review Committee had "determined that the medical evidence [did] not support a disabled status, as defined under the LTD Program." (Plf.'s L.R. 56.1 Stmt. App. at BCBSA 000446.) In this letter, BCBSA noted that it had reviewed all the evidence, including medical records, doctors' opinions, Speciale's claimant statement, and a Transferable Skills Analysis ("TSA") report. It further identified the evidence that supported a finding of disability and the evidence that failed to support such a finding. The specific evidence cited as not supporting disability included Progress Notes from office visits to Dr. Keane in April and June 2001, Dr. Keane's written statement that Speciale was physically capable of sedentary or light duty work, Dr. Snydersmith's statement that he no longer managed Speciale's pain and that a lumbar puncture ruled out MS, and a January 26, 2001, progress note from Dr. Cornelius Smith, a urologist at the Dreyer Medical Clinic, which stated that "this patient might be

exhibiting some drug-seeking behavior." (Progress Note, Jan. 26, 2001, at 1).[2] In a section titled "Gaps in the Evidence," BCBSA noted that Drs. Snydersmith, O'Shaughnessy, and Winny had all noted that Speciale was disabled or probably disabled due to MS. Because lab tests had demonstrated that Speciale, in fact, did not have MS, BCBSA appears to have discounted these findings. But the denial letter does not explain clearly how the doctors' evaluations were evaluated and weighed. Moreover, it found the evidence from Speciale's treating physicians incomplete because they provided no additional explanation or support for their diagnoses. The BCBSA Medical Director, Dr. Blonsky, reviewed Speciale's claim twice and determine that the progress notes from Dr. Keane and other medical evidence were insufficient to show that Speciale was disabled. The October 30, 2001 letter explained that BCBSA placed particular emphasis on Dr. Keane's evidence because he was an expert on pain management, rehabilitation, and function measurement; he had treated Speciale for a long period of time; and his opinion was specific and quantified and matched his clinical documentation. The Committee also requested and received a Transferable Skills Analysis, which reported that several comparable employment positions existed within the same salary range as Speciale's former position and which permitted employees to alternate sitting and standing and avoid bending and twisting. BCBSA determined, based on its review, that the record did not support a finding of disabled status on or about May 1, 2001, the date of Speciale's potential eligibility.

---

[2] Speciale contends that Dr. Smith was not one of her regular treating physicians. The record shows, however, that Dr. Smith saw Speciale in September 15, 2000. (Plf.'s L.R. Stmt. App. at BCBSA 000274.) He saw her again in early January 2001, when she was admitted to Copley Memorial Hospital with pain relating to a kidney stone. (Plf.'s L.R. Stmt. App. at BCBSA 000270.)

The denial of benefits letter explains how Speciale could appeal the Committee's decision, including specific suggestions about evidence that might strengthen her claim. In addition, the letter quotes from the Plan, including the definition of "disability" and the fact that a Participant is entitled to benefits "if he is found, on the basis of medical evidence satisfactory to the Committee, to be Disabled...." The letter does not quote or reference the Plan language stating that the Committee has "sole discretion" over disability determination.

Speciale appealed from the denial of benefits letter and submitted additional medical records. The additional evidence consisted of treatment notes by Drs. Keane and Winny. Dr. Winny also completed a Fibromyalgia Residual Functional Capacity Questionnaire on December 26, 2001, on which she stated that Speciale experienced pain that "frequently" interfered with her attention and concentration, and "markedly limit[ed]" her ability to deal with work stress. Also, Dr. Winny stated that Speciale could continuously sit for 10 minutes or stand for 15 minutes at one time, and could sit and stand or walk for less than two hours total in an eight hour working day. According to Dr. Winny's responses on the questionnaire, Speciale would need fifteen minute breaks every half hour during an eight hour work day, would be able to perform fine finger manipulations for approximately ten percent of an eight hour work day, and would be absent more than three times a month because of her impairments.

Dr. Blonsky reviewed Speciale's file again in April 2002 for her appeal. According to his notes from a telephone conversation he had with Dr. Ann Winny earlier that month, Dr. Winny stated that Speciale could attempt a job that did not involve travel or driving because trigger point injections control her fibromyalgia symptoms "for a while." The BCBSA Administrator, Grant, also confirmed that the Transferable Skills Analysis had identified positions that did not

require travel or driving. After reviewing the record, particularly Dr. Blonsky's opinion, Grant "conclude[d] that the weight of medical opinion fails to support that Ms. Speciale is disabled now or was disabled May 1, 2001." Grant denied Speciale's appeal on May 8, 2002.

On June 21, 2004, Speciale's counsel sent the Committee a copy of a Social Security Administration's Administrative Law Judge's opinion finding Speciale disabled under the Social Security Act.[3] Speciale also requested reconsideration of the Committee's denial of her appeal. BCBSA refused to reconsider the claim denial, noting that the Program did not provide for additional reviews after a "final decision by the Assistant Secretary." Further, BCBSA stated that it did not accord any "substantial weight" to the award of Social Security benefits because the definitions of disability and the standards for processing claims differ from the BCBSA Program.

Speciale contends that the Committee was "downright unreasonable" when it rejected the evidence of her progressively worsening symptoms, which were initially believed to be caused by MS. According to Speciale, BCBSA's review of her claim lacked fairness or reason, was based solely on Dr. Blonsky's opinions, and failed to consider her impairments in combination with each other and with the effects of her medications and treatment requirements. Finally, the Transferable Skills Analysis performed as part of BCBSA's review process failed to consider her difficulties with fatigue, medication side effects, or inability to perform regular overtime work. BCBSA argues that its denial of her claim was neither downright unreasonable nor implausible in light of the evidence. They argue that Dr. Blonsky, despite being a medical consultant for

---

[3] Counsel noted in her letter that she had previously sent the opinion to the Committee on October 23, 2002. The Committee denied receiving the 2002 letter and opinion. (Grant ltr. to Goldbloom, Aug. 26, 2004, at 1.)

BCBSA, had no incentive to deny Speciale's claim.[4] As to Dr. Blonsky's telephone conversation with Dr. Winny, BCBSA contends that it was entirely proper and emphasizes that Speciale has been unable to contradict Dr. Winny's statements to Dr. Blonsky.

Under the arbitrary and capricious standard, the administrator's decision will only be overturned if it is "downright unreasonable." *Carr v. Gates Health Care Plan*, 195 F.3d 292, 295 (7th Cir.1999). "It is not [the court's] function to decide whether [it] would reach the same conclusion as the Plan or even rely on the same authority." *Id*. at 294. The committee, however, must articulate a rational connection between the facts found, the issue to be decided, and the choice made. *Cozzie v. Metro. Life Ins. Co.*, 140 F.3d 1104, 1109 (7th Cir.1998). "Where the committee's interpretation of the plan defies all common sense, the district court must overturn that decision." *Dabertin v. HCR Manor Care, Inc.*, 373 F.3d 822, 828 (7th Cir. 2004) (citing *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir.2001) ("In some cases, ⋯ simple common sense will require the court to pronounce an administrator's determination arbitrary and capricious.")). If the administrator made an informed judgment and articulates an explanation for it that is satisfactory in light of the relevant facts, then that decision is final. *Tegtmeier v. Midwest Operating Engineers Pension Trust Fund*, 390 F.3d 1040, 1045 (7th Cir. 2004) (citing *Exbom v. Cent. States, S.E. & S.W. Areas Health & Welfare Fund*, 900 F.2d 1138, 1143 (7th Cir.1990)).

Speciale's argument that Dr. Blonsky's opinion somehow should be discounted because he merely read the medical records in her file and talked on the phone about her condition with

---

[4] In support of this mystifying argument, BCBSA states that its status as a non-profit association means that it stands to lose nothing when it grants claims.

her treating physician, Dr. Winny, and did not examine Speciale directly is insufficient to show unreasonableness by itself. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 830-31 (2003) (ERISA does not require Plans to give deference to treating physicians). But Dr. Blonsky's opinion is flawed because of the emphasis he–and Grant–placed on the difference between subjective and objective evidence of pain. In his recommendation to the Committee during Speciale's initial claim review, Dr. Blonsky wrote that Speciale complained of pain, "but has had fibromyalgia (?) [*sic*] for 20 years and worked.... This is a very marginal case because there are no absolute confirmatory findings, just a lot of subjective complaints." He then asks, "Were there any H.R., performance issues?" (BCBSA 000143-144.) As Judge Posner has written for the Seventh Circuit, "[p]ain often and in the case of fibromyalgia cannot be detected by laboratory tests.... It is 'subjective'–and [the Plan's medical consultant] seems to believe ... that because it is subjective [claimant] is not disabled." *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 919 (7th Cir. 2003). Had Dr. Blonsky's notes from the first review of Speciale's claim been his only contribution, this Court would have had little difficulty declaring the denial of benefits "downright unreasonable."

Dr. Blonsky also reviewed Speciale's file during her administrative appeal. Although he grounded his opinion that she was not totally disabled on his conversation with Dr. Winny, rather than his discomfort with "subjective" complaints of pain, Grant's explanation of her denial of the appeal echoed his earlier language. In her May 8, 2002, denial of benefits letter, Barbara Grant stated that Speciale's medical records "report her subjective symptoms, but ... do not objectively identify functional impairments." Because of the "lack of objective data in the records," Grant gave "weight by default to physician opinion." Grant then listed the various

physicians who had submitted opinions and what their opinions were. Ultimately, Grant concluded "the weight of medical opinion fails to support that Ms. Speciale is disabled now or was disabled May 1, 2001.... She had chronic complaints of pain and might not have been able to return to her job at HCSC but she was not prevented from earning a comparable salary for another employer in a position that did not require bending or twisting, that allowed her to alternately sit and stand, and that did not require travel." But this "conclusion" gives no explanation of why Grant disregarded Dr. Winny's written residual functional capacity questionnaire or the conclusion of three out of four of Speciale's treating physicians that she was disabled. Even making all reasonable assumptions in favor of the Plan, as the court must on a summary judgment motion, there is no "rational connection" between the facts found, the issue to be decided, and the choice made in the letter to Speciale. Simply put, there might have been a reason for the Administrator's decision but that reason does not appear in the written opinion and this Court is not to substitute its judgment for hers. This Court therefore finds that the Administrator was downright unreasonable when she denied Speciale's appeal. Speciale's motion for summary judgment is granted and Defendant's motion for summary judgment is denied.

**Conclusion**

For the foregoing reasons, Speciale's motion for summary judgment is granted and Defendant's motion for summary judgment is denied. Judgment is entered in favor of Speciale on her ERISA claim. Defendants shall pay LTD benefits to Speciale in an amount equal to the contractual benefit to which she is entitled. Such payments shall continue so long as Speciale meets the terms and conditions of the policy. Defendants shall pay prejudgment interest on all benefits that have accrued prior to the date of this judgment. Plaintiff is awarded attorneys' fees pursuant to 29 U.S.C. § 1132(g). This case is closed.

Enter:

/s/ David H. Coar

_____
David H. Coar
United States District Judge

Dated: **March 31, 2006**